IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

FILED
AUG 07 2024
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

Jessica Ferrato,
_____,
Plaintiff

-vs-

City of Lakewood, City of Cleveland,
Cuyahoga County, State of Ohio
Defendant(s)

CASE NO. _____

1:24 CV 01351

JUDGE RUIZ
JUDGE _____

COMPLAINT

Plaintiff seeks injunctive relief, damages, expungement, and federal protection on the basis of being targeted by what appears to be organized criminal activity regulated under federal racketeering laws (RICO), elements of which are detailed in the attached memorandum of facts.

[Signature]
8/6/2024

Jessica Ferrato
1543 Rosewood Avenue
Lakewood, OH 44107

Memorandum of Facts

Plaintiff Jessica Ferrato hereby requests a federal injunction, cease and desist, and expungement of criminal record against prosecutorial misconduct, targeted harassment, unreasonable utility shutoff, and property seizure by City of Lakewood, City of Cleveland, Cuyahoga County, and State of Ohio within the following scope on the grounds listed herein:

Plaintiff has for a period of several years been the target of ongoing municipal housing code violations by City of Lakewood building department staff, unconstitutional arrests by City of Lakewood police, and anonymous housing code complainants so numerous as not to be random, at her primary residence located at 1543 Rosewood Avenue. In addition Plaintiff has been subject to judicial and prosecutorial misconduct for such a number of petty misdemeanors as to have the appearance of giving her an unfairly tarnishing police record. The misdemeanors range from Plaintiff being cited for growing blackberries in her yard to violating unmarked school zones alongside a church. The criminal misdemeanors also include a long history of exterior paint violations which were indeed caused by an order from a municipal court judge that Plaintiff stop work on exterior paint which she was performing under the guidance of an individual who was later employed by the City of Lakewood as a residential home repair expert, and utilize the City's Operation Paint Brush program, a grant funded program that matches homeowners with lowest-bid contractors. After Plaintiff painstakingly restored the front facade of her home according to expert guidance in such a way that numerous neighbors stopped to mention that it was looking great, the paint contractors employed by the city's grant program came along to powerwash and spray paint the rest of the home's exterior in such a manner that the paint

contractors themselves apologized to Plaintiff for the inferior paint job they were about to do. From only a couple of years after this paint job ordered by the City of Lakewood, Plaintiff has had an ongoing exterior paint violation that stretches from one year to the next as the poorly applied paint continues to peel from the facade of all but the front of the home every year.

Complaints against Plaintiff's property have increased in number and frequency to the point that police officers have aggressively trespassed on her property and cited her with disorderly conduct for objecting. The most recent incident appears to have involved officers who formed a perimeter around her home in order to capture her on the street, tackling her off her bike onto the ground and charging her with obstruction of official business for the alleged crime of riding her bike on a public thoroughfare and speaking freely as her rights under the First Amendment allow. She was recently found guilty of riding her bike in a reckless manner at 5:30am despite a lack of evidence substantiating this charge and the appearance of these charges is that they were pressed in order to substantiate the obstruction of official business charge which arguably permitted the officers to tackle her to the ground without penalty.

This is not the first such police brutality case that the defendant has suffered. In 2003 she was arrested and her camera broken while she was videotaping a SWAT team attacking a crowd of peaceful anti-war protesters. Her recovered video footage exonerated one of the protesters and led to her own charges being dropped. The footage which includes interviews with officers before the attack on the protesters also seems to indicate that the police force were conducting a coordinated action against the protesters in order to curtail future anti-war protests. Since that time Plaintiff has been unable to use simple video editing equipment on a series of laptops, computers, and other electronic devices in such a way as to suggest that these capabilities were being remotely disabled by law enforcement in an effort to prevent her from sharing the video of police performing a coordinated attack on peaceful demonstrators. Plaintiff's ongoing

lack of technical capabilities in this regard have prevented her from editing her own documentaries and videos, thereby eliminating her capabilities in a chosen profession which is both to her financial detriment and to the detriment of her pursuit of happiness.

During a Lakewood traffic stop, law enforcement personnel once ordered Plaintiff out of her car and onto her knees at gunpoint where she was forced to apologize for suggesting that one of the officers was acting a little bit like a Nazi.

While she was working as a Water Conservation Coordinator for Ohio Sierra Club, Plaintiff would routinely post on social media as to her intended appearances at local volunteer and educational outreach events as part of her job. Not long after Plaintiff expressed on social media her objections to the police brutality case in which Tamir Rice was killed to death near the rapid station where her son sometimes changed buses on his way to school in Ohio City, Plaintiff experienced and reported unconstitutional Driver's License ID checkpoints within City of Cleveland along her route to gather materials for a volunteer river cleanup. The following day she was stopped by a police officer in Newburgh Heights along the route she would normally take to the cleanup event in such a manner as to suggest that he was waiting for her car specifically. While the officer was issuing multiple orders at once in such a manner as to make it physically impossible for her to comply, she was dragged physically out of her car and manhandled roughly by the officer, whose actions included pinning her to the back of his police cruiser and forcing her to spread her legs as he shoved the bulk of his body between them. He ordered her passenger to walk away down the highway and when a volunteer from the event, a respected local business owner, showed up offering to drive her vehicle along with the materials for the volunteer cleanup to the event, the officer refused and had the car impounded. It was later revealed via a five minute phone call to the Bureau of motor Vehicles that the charges of driving with a suspended license had occurred through an error at the BMV that appears to

have been orchestrated as a result of Plaintiff being pulled over three times within one month three years prior (including two instances of being targeted for driving 25 in unmarked church affiliated school zones within which Plaintiff's speed matched that of other drivers on the road, and one stop on the east side of Cleveland in which Plaintiff was charged with rolling through a stop sign along the route she usually took to an urban farm project of which she was a board member and which was later targeted for acquisition by undercover cops and members of a local chapter of Hell's Angels, at a traffic stop which took place AT the actual stop sign where Plaintiff was indeed stopped. In the latter case Plaintiff elected to pay the fine rather than go to court because the manner in which the arresting officer was behaving – taunting her with the ticket so that she would have to grab for it and then heckling that he could charge her with assault if she did so – suggested that he was completely unhinged and so Plaintiff did not relish the opportunity to face the arresting officer in court). It is worth noting here that at the time of the three earlier traffic incidents Plaintiff was awaiting a verdict on an appeal to a custody case between her and her ex-partner, Brad J Kuntz, whom she accused of physical, verbal, and financial abuse in her testimony. Plaintiff went to court for one of these three tickets in spring of 2011 and was subject to conviction due to an egregious misreading of statute by Lakewood's municipal judge at the time, who threatened Plaintiff with contempt charges for voicing her objection to the erroneous interpretation. Plaintiff paid the fines by mail on the other two charges without showing proof of insurance, and it was three years later in spring of 2014, following her objections to police brutality surrounding the shooting death of Tamir Rice, that she received a letter from the BmV indicating that her license would be suspended if she failed to show proof of insurance covering the month in 2011 when she was pulled over for the first of these citations. The letter indicated that she should ignore the letter if proof was already delivered and that she would not receive a notice of a suspension. She sent proof of insurance covering the month during which both violations occurred, and a week or two later, she received another such letter, which she ignored because she had already sent proof of insurance covering that month. It was

within a month or so of receiving and responding to these letters that Plaintiff encountered and reported an unconstitutional ID checkpoint along her normal route to publicly posted destinations, and was pulled over by a police officer in Newburgh Heights for a suspended license along with the sham allegations of having a loud muffler (which was a legal and EPA-checked turbo exhaust) and an obstructed windshield (due to a quarter sized spiderweb crack in the upper left corner resulting from landscaping debris that bounced out of a truck which Plaintiff had been driving behind). Neither of these citations were based on law, and the arresting officer turned his flashing lights and siren on as I was exiting the highway which was before he would have had a chance to run the plates, which gives the appearance that the officer was waiting for my car on the basis of knowing which route I would take to a publicly posted event.

A year later to the day, Plaintiff was physically assaulted by an RTA officer as she was departing the Greater Cleveland RTA station at 117th / madison in such an egregious manner that was caught on surveillance cameras that she was later awarded a settlement of $45,000 by RTA. It's worth noting that both this incident and the Newburgh Heights traffic stop occurred on the same day as Plaintiff's arrest in 2003 for videotaping the coordinated police assault on peaceful protesters in the days following the invasion of Iraq by US troops. It is also worth noting that following this incident Plaintiff received a medical diagnosis of PTSD related to the attack at the RTA station, and that she lost her job and health insurance shortly thereafter. As a condition of receiving the settlement she was asked to sign a waiver that she would not seek additional damages in the future in the state of Ohio, and also that she relinquish any source of public funding from the state of Ohio including medicaid. She insisted on negotiating a modified version of this waiver that did not force her to relinquish these specific rights, nevertheless Plaintiff has been systematically denied both medicaid coverage and coverage under the ACA marketplace since 2019.

At some point following the 2015 incident of police assault, Plaintiff was pulled over at the section of curved highway between 90 East and 77 South after attempting to change lanes and nearly swerving into an officer who'd admittedly been pacing her from her blind spot. When the officer pulled her she rolled down her window just a crack in order to pass her license and registration to the officer. He demanded that she roll her window down all the way, and Plaintiff refused to comply, remembering the incident in Newburgh Heights and citing PTSD from police brutality. After officer returned from his vehicle with a warning he confided in Plaintiff that he suffered from hearing loss in one ear as a result of injuries sustained in the military, and that he had become so enraged by the near-accident caused by my not seeing his cruiser occupying my blind spot for a distance of at least half a mile as he was pacing me traveling well within the posted speed limits that he "wanted to drag me out of my car and throw me up against his cruiser," an action which was apparently only narrowly prevented by Plaintiff refusing to roll her window down all the way.

In 2019 Plaintiff encountered another unconstitutional checkpoint along her route home from the Firefish Festival in downtown Lorain, for which she had been hired to do promotional video and marketing. She had been discussing with several other artists the possibility of driving in an artists' caravan to the southern border as a statement about child separations that were reportedly occurring. After she presented her license and informed the officers that their checkpoint was illegal, she was followed for several miles before being pulled over by one of the officers on suspicion of dubious charges. When Plaintiff pointed a video camera at the officer conducting the dubious traffic stop, he immediately desisted and allowed her to go along her way, indicating to Plaintiff that she might have encountered another case of brutality were she not to have had a live camera.

Later in 2019 as Plaintiff attempted to renew her driver's license she discovered that there was a block on her license. Plaintiff was traveling during the first month of 2020 and shortly thereafter the pandemic lockdowns shut down bmv offices for the better part of a year so Plaintiff was unable to determine the cause of the block on her license for a considerable portion of the pandemic lockdown, during which time she also experienced a variety of technical issues on her Apple devices preventing her from communicating with anyone outside of her immediate household. It was later discovered that the block arose from a police brutality case in 1999 in Camden, maine, for which she had never received a summons during the 6-year statute of limitations on criminal convictions or the 5-year additional extension on statute of limitations on convictions for defendants who were out of state for all of the 6 years. The case docket indicates that an attorney with whom defendant briefly consulted about the case appeared on her behalf without notice, and also that another attorney with whom Plaintiff is unfamiliar appeared on her behalf in a separate venue on the same case, but Plaintiff was never notified nor was she aware of these proceedings. The statute of maine also contains an article placing the burden on the state of maine to coordinate with other states to extradite defendants of any outstanding warrants, and though Plaintiff renewed her driver's license several times in the eleven years following the 1999 incident of police brutality against her, and underwent job related background searches for outstanding warrants, and was arrested following numerous incidents of police brutality in Ohio, and opened several bank accounts, the block against Plaintiff renewing her driver's license only appeared exactly 20 years to the day after the police brutality incident in maine, which is the exact length of time that it took for the statute of limitations on Plaintiff filing civil charges for police brutality to expire.

It's also worth noting that the case docket from maine indicates that someone tried unsuccessfully to revive these charges in 2012, at which time they were ruled moot, and that this time period aligns with the approximate time period during which Plaintiff was awaiting a

decision on an appeal to a custody case, which was filed one year prior close to the time that Plaintiff was being pulled over on a variety of egregiously petty charges.

It is also worth noting that after Plaintiff was denied the right to renew her drivers license in 2019, she noticed that a larger than typical number of drivers were similarly being turned away, and that at first the bmv were also refusing to issue her a state ID, and that she was required to provide proof of medical records and/or health insurance that she no longer had at the social security office in order to obtain a copy of her social security card necessary to obtaining state ID. Were it not for a copy of her medical records having been forwarded to a medical marijuana licensing facility she would not have been able to provide proof of such record, which would have made her unable to vote in the 2020 election due to the expiration of the Voting Rights Act earlier that same year, and that this appears to be part of a larger systemic process of denying citizens the right to vote in Ohio, which in turn appears to be related to a widespread turnover in housing that is being affected in part by targeted property seizures, land bank foreclosure turnovers and possible tax property fraud arising from the Cuyahoga County Treasurer's office.

Plaintiff has endured years of targeted harassment, housing code violation, utility shutoffs, and state level barricades to business registrations at two rental properties located in Collinwood at 17506 Lakeport Avenue (a single family residence) and 17304 Grovewood Avenue (a three story double storefront with two upstairs apartments) such that her enjoyment and right to do business at these locations has been extremely hampered. This includes a water shutoff at the property at 17506 Lakeport that has rendered the property unrentable and uninhabitable.

Plaintiff first experienced the problem of utility shutoff not long after she published an anonymous survey form for the purpose of allowing northeast Ohio residents to identify and report basement flooding issues that might be associated with sewer, stormwater, water main, or lateral pipe disrepair without providing their personal information to the City of Cleveland

Water Department. In the time since the survey was published (~2015) systemic water shutoffs within primarily black neighborhoods of the City of Cleveland have been driving residents, many of them registered Democrat voters, out of their properties in a manner that is inconsistent with the federal payment to the City of Cleveland of one billion dollars ($1B) to address sewer and stormwater issues. Rather than address sewer disrepair in these neighborhoods, the City of Cleveland used the $1B to build a large stormwater catchment pipe along Lakeshore Avenue. Plaintiff's property at 17506 Lakeport lies to the north of Lakeshore Avenue placing it downstream of the catchment. The sewer and stormwater lines for the property were permitted by the city in 1942. The property lies on a short block which dead ends at Euclid Creek. A condominium complex which was built after 1942 but prior to Plaintiff's purchase of the property in 2013 uses a pump station to pump sewage upstream to the wastewater network. It's possible that it is a result of an improperly permitted pump station at this location that the basement at Plaintiff's property at 17506 Lakeport frequently flooded with raw sewage during the first year that she owned the property, which is when the tenants at that property understandably made the decision to move out. Not wanting to place future tenants in a similar predicament, Plaintiff furnished the home and offered it as an AirBnB with the intent to move into it herself after her son graduated high school in Lakewood. But in 2017 after reporting the basement flooding issue to Ohio EPA, who approved the pump station, Plaintiff was informed by Water Department personnel that her property's pipes were crossed in such a way that the sewer pipe led directly to Euclid Creek and shut off her water as a result. An independent camera test performed for Plaintiff confirmed that the sewer and stormwater pipes lead properly to the street. When looking into the process for fixing the situation Plaintiff discovered that her burden as a homeowner to properly tie sewers to city infrastructure ends at the curb, however, no amount of negotiation would move the city to connect her property to the city-owned water and wastewater infrastructure in the street. Plaintiff has since lost both opportunity of investment as well as opportunity for enjoyment at this property since 2017, even though it is a delightful property with

a nice lot very close to the lake that many neighbors have expressed an interest in despite its current state of disrepair.

Plaintiff is currently being charged with obstruction of official business where the official business appears to involve state sanctioned racketeering via a section of Ohio Revised Code that allows government employees of any capacity to traffic scheduled narcotics as part of their official duties, along with a provision that allows healthcare professionals and others with Category III licenses to traffic and distribute to government employees of any capacity including municipal peace officers federally scheduled dangerous drugs including cocaine, methamphetamines, fentanyl, heroin, psylocybin, marijuana, and PCP. Her motion to dismiss the charges is included as Appenndix 1 to this motion. At this point following years of targeted abuse and judicial misconduct Plaintiff fears not only for her financial security but also her life and safety, and has faced law enforcement, judicial, and prosecutorial aggression enough times to fear that she will not receive a fair trial. She fears that the motives of all involved are to have her arrested for a bounty so that she be placed in prison and denied the right to vote, and that her properties may then be disbursed as a form of payment to the perpetrators through the Cuyahoga County land bank. Plaintiff therefore seeks immediate and urgent remedy from prosecution on these charges.

Plaintiff believes that this coordinated harassment is centered around property seizures and acquisitions in the Collinwood neighborhood being part of a racketeering scheme wherein state affiliated drug trafficking networks are using storefronts in the area as money laundering fronts, with the ultimate goal of keeping the properties until such time as a lakeshore hospital development and area park and land conservancy acquisitions drive the value of this lakefront neighborhood up. Plaintiff discovered evidence pointing to the possibility of such a network when she performed a business search of similar properties located on Grovewood Avenue

leading to an east side suburbs law firm with the initials LDD, and the stated business purpose of "limited drug distribution." One such property also appears to be listed under the ownership of a relative of the attorney who represented Plaintiff in her 2003 police brutality case and Plaintiff suspects he may have been bribed or coerced or may have been subject to digital communications interference of the type suffered by Plaintiff since the pandemic lockdown began as a way of ensuring a failure of representation with regard to her currently pending 2nd degree misdemeanor obstruction charges in the City of Lakewood. Upon consulting with Ohio Revised Code Plaintiff became aware that in the state of Ohio, not only federal officers but all government employees are legally permitted to buy, sell, repackage, transport, and distribute all schedules of dangerous drugs including cocaine, methamphetamines, and fentanyl as part of their official duties. It's also come to Plaintiff's attention that legal marijuana businesses who must find ways to launder their profits in order to spend them at banks might be part of a network of law enforcement officers laundering excessive quantities of trafficked drugs outside of their routine job duties, and that such a network may also be associated with political operatives being paid to eliminate voters from high-electoral-payoff regions in swing states, of which Ohio is easily one of high electoral value (such that the Republican National Convention was held in Cleveland in 2016). Plaintiff believes that such efforts to remove homeowners from North Collinwood in general and Plaintiff's property at 17506 Grovewood in particular may be associated with these activities, and also that such forced relocations of residents may already have been underway because of slated lakefront and park development along with the neighborhood being located close to the wondrous natural resource of Lake Erie contributing to homes in the neighborhood being extremely undervalued in relation to the rest of the housing market. Plaintiff is concerned that some of the purpose of relocating residents may be associated with efforts to change the voter demographics in this key electoral region.

Regarding the state of Ohio, Plaintiff attempted to register and was denied via letters from the Secretary of State's office designated trade names for operation of business to be conducted at the storefront property located on Grovewood Avenue as Plaintiff was attempting to open the location as a retail co-op offering a much needed source of fresh local foods in the neighborhood in the wake of the pandemic and the closure of the neighborhood's primary grocery source.

At around the same time that Plaintiff was being denied the right to register a business trade name, Plaintiff noticed that her gmail domain for another registered trade name had been reabsorbed by Google on a timeline not matching the expiration of said gmail domain, and that the gmail domain and Ohio registered trade name were associated with intellectual property that Plaintiff had registered with both the Writer's Guild of America (WGA) and the Library of Congress. The Secretary of State issued a letter to Plaintiff informing her that her Ohio registered trade name would expire on 3/26/23 unless she included her personal information on a web form to renew it. Plaintiff was of the fear at the time that she was being set up for suspicious activity related to a website previously active under said domain and Plaintiff was also at the time facing near constant phishing attempts for personal information on a variety of media that ultimately led to her bank accounts being hacked, and as such, Plaintiff was hesitant to renew the trade name registration for fear that her association with the account would be used to frame her for some mysterious and possibly criminal shenanigans in what appears to have evolved into a longstanding vendetta against her by persons or organizations associated with the local police and bureacratic network that had been similarly abusing her, and especially in light of the escalation of property transfers and violent crime that has overwhelmed northeast Ohio since the 2016 Republican National Convention and even moreso during and after the pandemic lockdowns. On the very day that Plaintiff's trade name registration expired in the State of Ohio, a television series called "Rabbit Hole" premiered on Paramount's streaming channel

which appears to be loosely based on a section of a four season arc "bible" for a television series registered with the WGA under the name "Rabbit Hole". The narrative described in Plaintiff's registered bible includes a description of a female protagonist realizing that she is under surveillance and developing a method of communication with those watching her as she attempts to discover who they are. The Paramount series stars Kiefer Sutherland as a target of not only aggressive surveillance but also assassination attempts and attempts to frame him for terrorism and treason as he attempts to discover who is targeting him and clear his name. Plaintiff has since not written more of the series, and the Paramount series likewise does not appear to be slated for a second season. The fact of Plaintiff's intellectual property being so egregiously stolen along with the fact that someone appears to have remotely disabled the screenwriting software on her laptop by changing the code have denied Plaintiff the right to earn a living in the screenwriting profession.

It's worth noting that the 90-page pilot for this series written by Plaintiff also includes twelve pages which were registered by Plaintiff with WGA under the name "Group Therapy" and which were workshopped at Yale in 2017 and then submitted to various screenplay competitions routinely read by Yale graduates. It came to Plaintiff's attention that the series "Severance" which appeared on AppleTV in 2021 contains similar thematic elements as well as an uncommon usage of a particular word which also appears in the twelve page script registered to Plaintiff, and that the process of changing the original draft to the version that appeared in the Golden Globe and WGA winning AppleTV script could have easily been altered using a simple iterative language translation algorithm of a type that one imagines might be shared among members of a collegiate fraternity or senior society for the purposes of avoiding detection by plagiarism software.

It was upon noticing these similarities that Plaintiff noted likewise similarities between this same twelve page script "Group Therapy" and thematic elements prevalent in the Writer's Guild nominated 2018 Netflix series "Maniac" starring Emma Stone and Jonah Hill, as well as the first season of Homecoming starring Julia Roberts which was released on Amazon Prime in 2019 and which was also nominated for Golden Globes and Writer's Guild Awards and adapted for a podcast.

Plaintiff has also recognized the imprint of her registered or copyrighted intellectual property in the screenplays of a film called "Barbarian" which appears loosely based on a five page script she wrote entitled "Hook Line and Sinker", and episode of the final season of the FX series "Better Call Saul" which appears to be based on a five page screenplay she wrote entitled "Three minute Egg", "Triangle of Sadness" which appears to be based on a two page script she published on her currently disabled Instagram account and which won the Palm D'or at Cannes and was nominated for a Best Original Screenplay Oscar, and "Barbie" which appears to borrow thematic elements and a notable monologue from a Facebook post written by Plaintiff. This is to suggest that Plaintiff recognizes that the value of her intellectual property and theft possibly associated with the absorption by the Ohio Secretary of State's office of her registered trade name may provide additional motive for the targeted harassment that she is currently facing, and that the value of these items for which she has never been credited nor paid greatly exceeds the value of the properties that she owns in Cleveland and Lakewood.

Plaintiff hereby requests a federal injunction against City of Lakewood on prosecution for obstruction charges, a cease and desist to City of Cleveland and Cuyahoga County on incursions and bureaucratic entanglement at her Cleveland located properties, an order of judgment that the City of Cleveland connect her sewer and stormwater for the single family home at 17506 Lakeport Avenue to municipal utilities infrastructure, and that the listed parties

be subject to payment of actual and punitive damages as appropriately determined in the interest of judgment.

In addition Plaintiff requests expungement of her criminal record and that her driving privileges be restored and / or that she be the beneficiary of a legal name change in order to avoid what appears to be such an extreme degree of targeted harassment that she has lost the ability to move freely and without fear of harm, to participate in digital media, and to conduct normal business transactions both as a consumer and in accordance with the laws of the United States.